JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Plaintiff-appellant, Progressive Plastics, Inc. ("PPI"), appeals from the decision and order of the Board of Tax Appeals ("BTA") upholding the final determination of the Tax Commissioner of Ohio ("Commissioner"), which increased the book value of PPI's inventory for personal property tax purposes and found that PPI had improperly excluded from its personal property tax return certain extrusion heads and screws used by PPI in its business. We affirm.
 {¶ 2} PPI manufactures and sells plastic bottles, which constitute its inventory. PPI has used the LIFO ("last-in, first-out") method of accounting for valuing its inventory for over 15 years.[1] After reviewing PPI's tax return for the year 2003, Ohio tax agents Richard Shank and Douglas Basista conducted a field audit at PPI. The agents determined that by failing to add the LIFO reserve back into its inventory computation, the LIFO method used by PPI significantly undervalued its inventory. The agents determined that the FIFO method of accounting for inventory more accurately reflected the true value of PPI's *Page 4 
inventory and, accordingly, adjusted PPI's inventory valuation by $181,510. In addition, the agents determined that certain extrusion heads and screws were not exempt from taxation as "dies" used in the bottle manufacturing process.
 {¶ 3} PPI filed a petition for reassessment, which the Commissioner subsequently denied. Thereafter, PPI filed an appeal with the BTA. In lieu of a hearing before the BTA, the parties stipulated that the appeal would be resolved by the record and briefs submitted by the parties. The depositions of agents Shank and Basista were also entered into evidence. The BTA subsequently affirmed the Commissioner's decision.
STANDARD OF REVIEW
 {¶ 4} In reviewing a decision of the BTA, this court is limited to a determination from the record of whether the decision was "reasonable and lawful." R.C. 5717.04; PPG Industries, Inc. v. Kosydar (1981),65 Ohio St.2d 80, 81, citing Wheeling Steel Corp. v. Evatt (1944),143 Ohio St. 71, 77. We may reverse a decision based upon an incorrect legal conclusion, but factual determinations made by the BTA will be affirmed if the record contains reliable and probative support for those determinations. A. Schulman, Inc. v. Levin, 116 Ohio St.3d 105,2007-Ohio-5585, ¶ 6, citing Gahanna-Jefferson Local School Dist. Bd. ofEdn. v. Zaino (2001), 93 Ohio St.3d 231, 232 and Am. Natl. Can Co. v.Tracy (1995), 72 Ohio St.3d 150, 152. The Tax Commissioner's findings "`are presumptively valid, absent a demonstration that those findings are clearly *Page 5 
unreasonable or unlawful.'" A. Schulman, supra, ¶ 7, quotingNusseibeh v. Zaino, 98 Ohio St.3d 292, 2003-Ohio-855, ¶ 10.
INVENTORY VALUATION
 {¶ 5} With respect to inventory valuation, PPI contends that under Ohio law, it can use whatever method of accounting it chooses, PPI's book value of its inventory is presumed to be the "true value" for personal property tax purposes, and the Commissioner was required to make a "finding" that the "true value" was more than that reflected on PPI's books. PPI contends that because the Commissioner made no such "finding," PPI's book value of its inventory must be taken as the "true value" for tax purposes.
 {¶ 6} PPI's assertion that it may use whatever method of accounting it chooses to value its inventory is correct. "The law does not require the owner of personal property used in business to adopt any particular method of accounting in determining the book value of his inventory. For the purpose of the operation of its business, [a taxpayer] may, in determining book value, adopt any sound and generally recognized method of accounting it chooses." R.H. Macy Co., Inc. v. Schneider (1964),176 Ohio St. 94, 96.
 {¶ 7} "True value," however, is the ultimate test in the valuation of personal property under R.C. Chapter 5711, which governs the taxation of personal property. Youngstown Sheet Tube Co. v. Kosydar (1975),44 Ohio St.2d 96. "Property taxes are levied upon true value and not upon estimated *Page 6 
book value determined by a choice of an accounting practice preferred by the taxpayer." Howard Paper Mills, Inc. v. Lindley (Jan. 14, 1980), 2nd Dist. No. CA 6522. R.C. 5711.18 recognizes the difficulty inherent in determining the true value of personal property and, accordingly, provides that the depreciated book value of such property "shall be taken as the true value of such property, unless the assessor finds that such depreciated book value is greater or less than the then true value of such property in money." Thus, R.C. 5711.18
allows the Tax Commissioner to revalue the taxpayer's inventory if the assessor finds that the true value of such inventory is greater or lesser than its book value. PPG Industries, supra at 81; R.H. MacyCo., supra.
 {¶ 8} Under R.C. 5711.21, whenever property is to be assessed at its true value, "the assessor shall be guided by the statements contained in the taxpayer's return and such other rules and evidence as will enable the assessor to arrive at such true value." (Emphasis added.)
 {¶ 9} Reading R.C. 5711.18 and 5711.21 in conjunction, "[t]he assessment of personal property requires the assessor to consider the book value as stated by the taxpayer, together with other statements of the taxpayer and other available evidence, and apply the applicable rules of valuation to arrive at the ultimate goal of the assessment, a determination of the true value of the property." R.H. Macy Co., supra at 96. *Page 7 
 {¶ 10} In this case, the Commissioner determined that the FIFO method of valuing PPI's inventory was a more accurate "true value" of its inventory than the LIFO method used by PPI. PPI contends, however, in reliance on R.C. 5711.18 and 5711.21, that its valuation of its inventory under the LIFO method constituted prima facie evidence of the true value of its inventory which the Commissioner was required to accept unless he made a "finding," based on evidence, that the book value as reported by PPI was not the true value of its inventory.
 {¶ 11} The Ohio Supreme Court has previously rejected this argument. In Champion Spark Plug Co. v. Lindley (1983), 6 Ohio St.3d 56, the appellant argued "that the book value listed on its personal property tax return using the LIFO method of valuing inventories constitutes prima facie evidence of true value which [the Commissioner] must either accept or overcome through the production of evidence to the contrary." Id. at 57. Quoting Youngstown Sheet Tube Co., supra, the Supreme Court rejected this argument, stating, "***the taxpayer's book value of its inventory is merely evidence of true value and will be taken as prima facie evidence of true value only when the Tax Commissioner has failed to find that such book value is greater or less than true value in money of such property." Id. (Emphasis added.) The Supreme Court found that Champion Spark Plug's actual inventory practices, as testified to by its treasurer and controller, were actually more consistent with the FIFO method of *Page 8 
accounting, as determined by the Commissioner, and therefore affirmed the application of the FIFO method to assess Champion Spark Plug's inventory.
 {¶ 12} PPI argues that Champion Spark Plug is distinguishable, however, because that case contained evidence of the taxpayer's actual inventory practices, whereas here, neither the auditors nor the Commissioner cited any evidence specific as to how PPI actually processes its inventory to suggest that LIFO is not an appropriate valuation. PPI further contends that the Department of Taxation and the Commissioner were of the position that, as a matter of law, PPI could not properly value its inventory using the LIFO method. Neither assertion is correct.
 {¶ 13} Admittedly, it appears that the Department and Commissioner are of the opinion that LIFO generally leads to unrealistic valuations of inventory. But
 {¶ 14} the depositions of both agents Shank and Basista indicate that the Department will allow a taxpayer to use LIFO to value its inventory if that method more accurately reflects the inventory's true value. Agent Shank testified that the "[the Department's] position on the LIFO method is if you can prove that this more accurately reflects the inventory in today's dollars [i.e., its true value] then we will accept it." Agent Basista testified that although LIFO is not the appropriate method of determining true value "in most cases," "you can use it but *** you have to show why LIFO is a more accurate measurement than *Page 9 
FIFO or any other measurement." Basista testified further that the value PPI assigned to its inventory was "not automatically" determined to be incorrect merely because PPI was using the LIFO method; rather, as both Shank and Basista testified, PPI's failure to add the LIFO reserve into its inventory valuation caused the amount reported by PPI on its personal property tax return to be less than the true value. Thus, PPI's argument that the Department and the Commissioner had a preconceived notion that PPI could not use LIFO, as a matter of law, is without merit.
 {¶ 15} PPI's argument that the Commissioner made no "finding" that PPI's book value of its inventory was not the true value of such property is similarly without merit, as the Commissioner's "finding" that the FIFO method of valuation was a better indicator of the value of PPI's inventory than LIFO is manifest in his final determination.
 {¶ 16} The record demonstrates that PPI failed to provide sufficient evidence that LIFO accurately reflected the true value of its inventory. Agent Shank testified that the Department "would consider any evidence that [a taxpayer] would give us" to demonstrate that LIFO is the correct method of inventory valuation, but "there was no evidence presented [by PPI] to show the method that Progressive Plastics was using reflected what the Department requires in inventory dollars." Shank testified that he reviewed an inventory report provided by Brian Gill, PPI's Vice-President of Finance, which included *Page 10 
information regarding raw materials, work in progress, and finished goods. In addition, Shank met with Gill. According to Shank, Gill did not provide sufficient explanation regarding why the LIFO method provided the true value of PPI's inventory:
 {¶ 17} "You know, just based on the information that was provided by Mr. Gill and Mr. Gill also gave us a very nice synopsis of LIFO versus FIFO and his [sic], I think he actually explained it very well. I mean, we talked about it, though, and just the fact that in LIFO dollars in the plastics industry I don't think that fairly represented the inventory that they had on hand in 2002 which would be reported on their 2003 return and he could not come up with a good explanation of why he's not returning the LIFO reserve." Later, Shank testified, "Mr. Gill offered no evidence to support any use of [the LIFO] method."
 {¶ 18} Moreover, the evidence PPI did provide to the Department indicated that FIFO was, in fact, the appropriate method of valuing its inventory. A memo from Adele Noga at PPI to Mark A. Kitka, Esq., dated October 31, 2003 explaining the LIFO process and the purpose of PPI's LIFO calculations was sent by Kitka to agent Basista on November 10, 2003 as part of PPI's explanation of its LIFO reserve calculations. In the memo, Ms. Noga unequivocally stated, "[e]ven though LIFO is used forbalance sheet valuation of inventories, our company uses raw materialsand ship[s] finished goods on a first-in, first-out (FIFO) basis. Thephysical flow through the plant is also first-in, first-out." *Page 11 
(Emphasis added.) The affidavit of Rome P. Busa, Jr., PPI's chief operating officer and chief financial officer, although more equivocal than Noga's statement, indicated that PPI's actual inventory system was at best a hybrid LIFO/FIFO system, but certainly not exclusively LIFO. Thus, the Commissioner's finding that FIFO more accurately measured the true value of PPI's inventory than FIFO was adequately supported by evidence.
 {¶ 19} In its decision and order affirming the Tax Commissioner's final determination, the BTA found that a taxpayer challenging a finding of the Commissioner must rebut the presumption that the Commissioner's findings are valid and has the burden of showing in what manner and to what extent the Commissioner erred. See, e.g., Shiloh Automotive, Inc.v. Levin, 117 Ohio St.3d 4, 2008-Ohio-68, ¶ 16. PPI argues that the BTA erred in placing the burden on PPI to rebut the Commissioner's increase in tax because the Commissioner failed to meet his initial burden of making a finding based on evidence, as required by R.C. 5711.18, that the FIFO method more accurately valued PPI's inventory than LIFO. We disagree. As discussed above, the Commissioner found that FIFO was a more accurate method of inventory valuation and the evidence, by PPI's own admission, indicated that PPI's inventory actually turns over in a manner consistent with the assumption upon which the FIFO method is based. In light of the Commissioner's finding, the BTA did not err in imposing a reciprocal burden on PPI to rebut the Commissioner's finding. *Page 12 
 {¶ 20} On this record, the decision of the BTA, which affirmed the Tax Commissioner's decision regarding the taxable true value of PPI's personal property for the 2003 tax year, was neither unreasonable nor unlawful. Appellant's first and second assignments of error are therefore overruled.
EXTRUSION HEADS AND SCREWS
 {¶ 21} Under R.C. 5709.01(B)(1), personal property located and used in business in Ohio is subject to taxation, but R.C. 5701.03(A) excludes from the definition of personal property any "dies *** that are held for use and not for sale in the ordinary course of business." As a tax-exemption provision, R.C. 5701.03(A) must be strictly construed,Campus Bus. Serv. v. Zaino, 98 Ohio St.3d 463, 2003-Ohio-1915, ¶ 8, and the burden rests with PPI "to show that the property is entitled to exemption." R.C. 5715.271.
 {¶ 22} The Ohio Supreme Court "has variously described dies as (1) devices that "`through applied force, impose their shape'" on an object under production, Timken Co. v. Lindley (1985), 17 Ohio St.3d 85, 87, quoting the BTA, (2) `piece[s] of equipment or tooling that [are] capable of forming or creating a part, either by pressure or molding techniques,' Gen. Motors Corp. v. Kosydar (1974), 37 Ohio St.2d 138, (3) devices that `form the desired metal, rubber or plastic part when pressure is applied by mechanical or hydraulic presses,' id., (4) parts with `specially designed surfaces' in a machine whose `sole purpose and use is to imprint or impress specially designed irregularities *** upon material placed in *Page 13 
the machine,' Am. Book Co. v. Porterfield (1969), 18 Ohio St.2d 49, 53, and (5) special devices `which by their nature are capable of only special uses' for impressing, shaping, or forming something,Colonial Foundry Co. v. Peck (1952), 158 Ohio St. 296, 301." A.Schulman, Inc., supra at ¶ 9.
 {¶ 23} In its third assignment of error, PPI asserts that the extrusion heads and screws operate in conjunction to produce a final product by applying pressure to shape and form the material. Simply put, it contends that by applying heat and pressure, the extrusion heads change the resin into a substance that can be molded into the shape of a bottle, and the extrusion screws then regulate the flow of the plastic into the mold. It contends that for the 14 extrusion blow molding machines in use during a one-year period, it used 293 different molds, which required 326 head changes. Therefore, it argues that because the heads and screws need to be changed depending on what mold is used, they are product specific, and hence exempt from personal property taxation as dies. PPI contends that the recent Ohio Supreme Court case of A.Schulman, supra, supports its argument.
 {¶ 24} The taxpayer in A. Schulman produced plastic resins and compounds. The facility manager for the company testified at the BTA hearing that the company heated resin and other materials inside "barrel and screw" devices such that the mixture would melt and turn into taffy-like molten plastic. He testified that the screw inside the barrel would convey the material to the *Page 14 
die at the end of the barrel, and the molten plastic would then go through the die, which would shape the plastic into small pellets. Id. at ¶ 10.
 {¶ 25} In light of this testimony, the Supreme Court held that the BTA had erred in finding that the barrel and screw devices were dies exempt from taxation. The Supreme Court found that the facility manager testified that the barrel and screw devices would "stay the same" even as different dies were placed at the end of the barrel to produce plastic pellets of different sizes. Id. at ¶ 13. Accordingly, it found that the barrel and screw devices did not "impose their shape" on an object under production, as the plastic pellets produced by the company took their shape not from the barrels themselves but from the dies at the end of each barrel. It held that although the barrel and screw devices provided the pressure that moved the molten plastic material to and through the dies, they were themselves not dies. Id.
 {¶ 26} PPI contends that A. Schulman indicates that because its extrusion heads and screws must be changed for different molds, they are necessarily dies. We are not persuaded.
 {¶ 27} In A. Schulman, the Supreme Court focused on whether the barrel and screw devices participated in imposing a shape to the ultimate product, and found that they did not. The same holds true here. The evidence indicated that the extrusion screw receives the resin pellets, transports the pellets into the mold, and controls the flow of melted resin into the mold. The extrusion head *Page 15 
melts the resin pellets. Although the extrusion screws are necessary for the production of the plastic containers, they are not directly involved in forming the containers; it is the mold itself, and not the extrusion screw, which forms the containers. The plastic is shaped into a container in the mold long after it has passed through the extrusion screw. Likewise, although the extrusion heads melt the pellets, they are not directly involved in the formation of the containers.
 {¶ 28} As the BTA stated in its decision affirming the Commissioner's finding that the extrusion heads and screws were not exempt as dies, "[w]hile there may be an additional obligation to change the extrusion heads and screws based upon the makeup of the mixture ultimately forced through, the actual imposing of a shape is done by a mold. The extrusion heads and screws work together to create the usable material necessary to form a mold, but do not participate in the formation process."
 {¶ 29} Appellant's third assignment of error is overruled.
Affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 16 
MARY EILEEN KILBANE, P.J., and JAMES J. SWEENEY, J., CONCUR.
[1] LIFO assumes that the last merchandise purchased or manufactured by a merchant is sold by the merchant before he sells the older merchandise in stock. FIFO ("first-in, first-out") assumes that the first inventory purchased or manufactured is the first inventory sold. FIFO generally better reflects the current replacement costs of the inventory than LIFO because the average inventory values under the FIFO method will be based on the acquisition costs of the most newly acquired inventory, rather than the earliest acquired inventory. *Page 1